ERIK A. OLSON [8479]
EOLSON@MOHTRIAL.COM
TREVOR C. LANG [14232]
TLANG@MOHTRIAL.COM
**MARSHALL OLSON & HULL, P.C.**
NEWHOUSE BUILDING
TEN EXCHANGE PLACE, SUITE 350
SALT LAKE CITY, UTAH 84111
TELEPHONE: 801.456.7655

ATTORNEYS FOR DEFENDANT
AND COUNTERCLAIM PLAINTIFF

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| C7 DATA CENTERS, INC., a Utah corporation,<br><br>    Plaintiff,<br>v.<br><br>COINTERRA, INC., a Delaware corporation,<br><br>   Defendant. | **ANSWER AND COUNTERCLAIM**<br><br><br>Civil No. 2:15-cv-00019-DN |
| AND RELATED COUNTERCLAIMS. | |

Defendant CoinTerra, Inc. ("CoinTerra") hereby responds to the complaint of plaintiff C7 Data Centers, Inc. ("C7") as follows:

### <u>ANSWER</u>

### <u>FIRST DEFENSE</u>

The complaint fails to state a claim against defendant on which relief may be granted.

## SECOND DEFENSE

Defendant responds to the individually numbered paragraphs of the complaint by admitting, denying, and alleging as follows:

1.      Admitted.

2.      Admitted.

3.      Denied.

4.      Responding to the allegations of paragraph 4, defendant affirmatively alleges that the Master Services Agreement speaks for itself as to its legal meaning and effect, and defendant denies every allegation in paragraph 4 inconsistent therewith.

5.      Responding to the allegations of paragraph 5, defendant affirmatively alleges that the Master Services Agreement speaks for itself as to its legal meaning and effect, and defendant denies every allegation in paragraph 5 inconsistent therewith.

6.      Admitted.

7.      Responding to the allegations of paragraph 7 defendant affirmatively alleges that the Master Services Agreement speaks for itself as to its legal meaning and effect, and defendant denies every allegation in paragraph 7 inconsistent therewith.

8.      Responding to the allegations of paragraph 8, defendant affirmatively alleges that the Master Services Agreement speaks for itself as to its legal meaning and effect, and defendant denies every allegation in paragraph 8 inconsistent therewith.

9.      Responding to the allegations of paragraph 9, defendant affirmatively alleges that the Master Services Agreement speaks for itself as to its legal meaning and effect, and defendant denies every allegation in paragraph 9 inconsistent therewith.

10.     Admitted.

11.     Responding to the allegations of paragraph 11, defendant admits that electronic equipment, such as computer servers, among other things, requires electricity to function. Defendant denies the remaining allegations of paragraph 11.

12.     Defendant is without knowledge and information sufficient to form a belief as to the truthfulness of the allegations in paragraph 12, and therefore denies the same.

13.     Defendant is without knowledge and information sufficient to form a belief as to the truthfulness of the allegations in paragraph 13, and therefore denies the same.

14.     Denied.

15.     Responding to the allegations of paragraph 15, defendant affirmatively alleges that the Master Services Agreement speaks for itself as to its legal meaning and effect, and defendant denies every allegation in paragraph 15 inconsistent therewith.

16.     Responding to the allegations of paragraph 16, defendant affirmatively alleges that the Master Services Agreement speaks for itself as to its legal meaning and effect, and defendant denies every allegation in paragraph 16 inconsistent therewith.

17.     Responding to the allegations of paragraph 17, defendant affirmatively alleges that the Master Services Agreement speaks for itself as to its legal meaning and effect, and defendant denies every allegation in paragraph 17 inconsistent therewith.

ANSWER AND COUNTERCLAIM

18.     Defendant is without knowledge and information sufficient to form a belief as to the truthfulness of the allegations in paragraph 18, and therefore denies the same.

19.     Denied.

20.     Denied.

21.     Denied.

22.     Responding to the allegations of paragraph 22, defendant admits that C7 may be entitled to some amount of money under the Master Services Agreement following certain offsets due to defendant because of its counterclaims.  Defendant denies the remaining allegations of paragraph 22.

23.     Responding to the allegations of paragraph 23, defendant affirmatively alleges that the Master Services Agreement speaks for itself as to its legal meaning and effect, and defendant denies every allegation in paragraph 23 inconsistent therewith.

24.     Denied.

25.     Responding to the allegations of paragraph 25, defendant admits that it received notices from C7 regarding the parties dispute.  Defendant denies the remaining allegations of paragraph 25.

26.     Responding to the allegations of paragraph 26 defendant affirmatively alleges that the Master Services Agreement speaks for itself as to its legal meaning and effect, and defendant denies every allegation in paragraph 26 inconsistent therewith.

27.     Responding to the allegations of paragraph 27, defendant affirmatively alleges that the Master Services Agreement speaks for itself as to its legal meaning and effect, and defendant denies every allegation in paragraph 27 inconsistent therewith.

28.     Responding to the allegations of paragraph 28, defendant affirmatively alleges that the Master Services Agreement speaks for itself as to its legal meaning and effect, and defendant denies every allegation in paragraph 28 inconsistent therewith.

29.     Denied.

30.     Defendant realleges and incorporates by reference each of the foregoing paragraphs.

31.     Admitted.

32.     Denied.

33.     Denied.

34.     Denied.

35.     Defendant realleges and incorporates by reference each of the foregoing paragraphs.

36.     Denied.

37.     Denied.

38.     Denied.

39.     Denied.

40.     Denied.

Defendant denies every allegation in the complaint not specifically admitted or denied above.

### **THIRD DEFENSE**

Defendant hereby asserts the following affirmative defenses to the claims in the complaint:

1.      Plaintiff's claims are barred in whole or in part by the doctrines of waiver, estoppel, and laches.

2.      Plaintiff's claims are barred in whole or in part by the doctrines of accord and satisfaction.

3.      Plaintiff's claims are barred in whole or in part by its unclean hands and other wrongful conduct.

4.      Plaintiff's claims are barred in whole or in part to the extent that plaintiff has mitigated its damages or failed to mitigate its damages.

5.      Plaintiff's complaint has been brought in bad faith.  Pursuant to Rule 11 of the Federal Rules of Civil Procedure, Utah Code § 78B-5-825, and the Court's inherent powers, defendant is entitled to recover its attorney fees and costs.

6.      Plaintiff's claims are barred in whole or in part because defendant's conduct at all times was reasonable, proper, and in good faith, and defendant did not directly or indirectly undertake any action in violation of the law or in derogation of any agreement with or understanding of plaintiff.

7.    Plaintiff's alleged damages were self-inflicted or resulted from unavoidable circumstances, causes beyond the control or fault of defendant, or acts or omissions of third parties over whom defendant has no control and for whose acts or omissions defendant has no liability.

8.    Plaintiff's claims are barred in whole or in part by principles of consent, acquiescence, ratification, and/or legal justification.

9.    Plaintiff has materially breached an agreement or understanding between or among the parties—with such breach occurring prior to all other alleged breaches.

10.    Plaintiff's claims are subject to offset.

11.    Recovery would result in unjust enrichment to plaintiff.

Defendant reserves the right to assert such additional affirmative defenses as may become apparent through the conducting of discovery or the natural progression of this case.

WHEREFORE, defendant prays that plaintiff's complaint be dismissed with prejudice and on the merits, that plaintiff take nothing thereby, that defendant be awarded its reasonable attorney fees and costs incurred in defending against plaintiff's complaint, and for such other and further relief as the Court may deem appropriate under the circumstances.

## COUNTERCLAIM

Counterclaim plaintiff CoinTerra hereby counterclaims against counterclaim defendant C7, and allege as follows:

## GENERAL ALLEGATIONS

### The Parties

1.    CoinTerra, Inc. is a Delaware corporation with its principal place of business in Austin, Texas.

2.    On information and belief, C7 Data Centers, Inc. is a Utah corporation with its principal place of business in Lindon, Utah.

### Jurisdiction and Venue

3.    Jurisdiction is conferred on this Court by 28 U.S.C. § 1332 as a result of diversity of citizenship.  The parties are citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4.    Venue is proper in this District under 28 U.S.C § 1391.

5.    This Court has supplemental jurisdiction over CoinTerra's state law claims under 28 U.S.C. § 1367 since those claims arise from the common nucleus of operative facts alleged in CoinTerra's claims.

### The Parties' Businesses

6.    CoinTerra is a hardware and software development company that designs, produces, and operates computer systems that facilitate and contribute to the Bitcoin blockchain network.[1]

---

[1] Bitcoin is a type of digital currency in which encryption techniques are used to regulate the generation of units of currency and verify the transfer of funds, operating independently of a central bank.

7.      Specifically, CoinTerra offers for sale computer servers ("Servers") intended to "mine Bitcoin"[2] and/or "mining contracts," in which customers purchase a specific amount of compute power provided by the Server for a predetermined period—rather than purchase their own Server—from CoinTerra, which in turn, operates or contracts for the operation and storage of its Servers to mine Bitcoin at various locations ("Data Centers").

8.      C7 is one such Data Center that offers space for the storage, housing, and related services for the Servers, such Servers may be owned by CoinTerra or its customers.

9.      Bitcoins can be bought and sold with different currencies from individuals and companies.  Bitcoins may be purchased in person, through Bitcoin exchanges, or at a Bitcoin ATM in exchange for cash currency.  Participants in online exchanges offer Bitcoin buy and sell bids.[3]

10.     In order to maximize the amount of Bitcoin "mined" by the Servers, the Servers must operate in optimal conditions.

11.     Adverse temperature conditions (e.g., overheating) and environmental conditions such as the presence of dust, dirt, or insects can adversely affect the Servers functionality and decreases their productively; thus, resulting in less total Bitcoin mined.

---

[2] Computer servers mine Bitcoin through the use of special hardware and software to solve math problems and are issued a certain number of Bitcoins in exchange.

[3] Presently, one (1) Bitcoin equals $267.23 U.S. Dollar (Bitcoin exchange rate) (Jan. 5, 2015) (11:43 MST).

ANSWER AND COUNTERCLAIM

12.    The Servers owned or operated by CoinTerra depreciate quickly because of the rapid growth of the "Bitcoin Network," [4] rapid advances and developments in computer hardware and software technologies, and fluctuations in the value of Bitcoin.

### The Parties' Agreements

13.    On or about April 9, 2014, CoinTerra and C7 entered into the Master Services Agreement ("MSA") and an accompanying Statement of Work ("SOW").  [Attached as Ex. A and B (respectively).]

14.    The term of the MSA and SOW is "18 months beginning [on] the date of installation" of the Servers.  [SOW ¶ 3.2.]

15.    In exchange for storing and housing the Servers with C7, CoinTerra agreed to pay C7 a monthly recurring payment.  [SOW ¶ 3.1.]

16.    The SOW required C7 to supply "space for 50 cabinets [or 500 Servers] in the C7 Data Center."  [SOW ¶ 1.1(a).]

17.    The cabinets provided by C7 are "Lockable."  [SOW Appendix A.]

18.    Under the SOW, C7 was to supply the space for 500 Servers by April 15, 2014. [SOW ¶ 3.2.]

---

[4] Unique to the Bitcoin industry is the concept of "network difficulty."  Network difficulty is directly proportional to the total compute power of the Bitcoin Network.  As the total compute power of the Bitcoin Network grows, the difficulty of the math problems increases to ensure that Bitcoins are mined at a predictable rate.  Hence, as the Bitcoin Network grows, the difficulty of each math problem becomes more complex—which results in a single Server mining less total Bitcoin.

19.    Following, execution of the MSA and SOW, the parties entered into Addendum A on or about April 20, 2014.  [Addendum A (Apr. 20, 2014) (attached as Ex. C).]

20.    Addendum A provides that C7 will provide 150 cabinets to store and house 1500 Servers in a "custom, private suite with sufficient power . . . and cooling within 4 weeks of signature."  [Addendum A.]

21.    Like the MSA and SOW, Addendum A indicates that the term shall be 18 months, specifies a monthly payment amount, and designates a physical location (i.e., "Private Suite GPC building") for storage and housing of the Servers.  [*Id.*]

22.    Pursuant to Addendum A, C7 was obligated to provide space for 1500 Servers by May 18, 2014.  [*Id.*]

23.    Addendum A "is subject to the terms of the Master Service Agreement (MSA) and Statement of Work (SOW)."  [*Id.*]

24.    Further, subsequent to Addendum A, the parties entered into Addendum B/C[5] on or about May 7, 2014.  [Addendum B/C (May 7, 2014) (attached as Ex. D).]

25.    Addendum B/C provides that C7 will provide 10 "Lockable" cabinets to  store and house 100 Servers.  [Addendum B/C.]

26.    Like the previous agreements, Addendum B/C indicates that the term shall be 18 months, specifies a monthly payment amount, and designates a physical location (i.e., "Granite Pt. II") for storage and housing of the Servers.  [*Id.*]

---

[5] Both Addendum B and Addendum C are identical in their terms and show an identical signature by CoinTerra; yet, at some point the "B" was blacked out and replaced with a "C."

27.     Addendum B/C "is subject to the terms of the Master Service Agreement (MSA) and Statement of Work (SOW)."  [*Id.*]

28.     Under "Time Schedules," the MSA identifies that "TIME IS OF THE ESSENCE TO THIS AGREEMENT AND EACH SOW."  [MSA ¶ 1.1 (capitalization in original).]

29.     The MSA, SOW, Addendum A, and Addendum B/C (collectively, the "Agreements") identifies specific locations owned or otherwise controlled by C7 (e.g., "Timpanogos," "City Creek," "GPC Suite," "Granite Point 1," and "Granite Point 2") (collectively, the "Facilities"), which house or store the Servers.

30.     In total, CoinTerra contracted with C7 for the storage and housing of 2100 Servers at C7's Facilities.

31.     Of the 2100 Servers, approximately 271 are directly owned by CoinTerra's customers and have contracted with CoinTerra for their operation.

32.     Under the SOW, C7 was obligated, among other things, to provide a "constant supply of power" [SOW ¶ 1.5(b)] and "advance cooling systems" [SOW ¶ 1.5(e)] for the Servers at the Facilities.

## <u>C7's Breach of the Agreements</u>

33.     In accordance with Addendum A, C7 failed to supply the space for 1500 Servers by May 18, 2014.  While CoinTerra had all 1500 Servers ready for installation and operation, C7 failed to provide complete space for the Servers until late June 2014.

34.     Based on C7's delay, CoinTerra was required to engage another facility to store and house the Servers for operation until C7 made available the space for 1500 Servers as obligated by Addendum A.

35.     Moreover, pursuant to the SOW, C7 failed to supply the space for 500 Servers by April 15, 2014.  While CoinTerra had all 500 Servers ready for installation and operation, the Servers were not operational by April 15, 2014.

36.     As a result of C7's failure to provide the space identified in the parties Agreements, CoinTerra lost millions of dollars in revenue because the Servers were not operational during such periods.

37.     Upon finally providing the necessary space to store and house the Servers in C7's Facilities, at least two of the three Facilities failed to provide "advance cooling systems" for the Servers.

38.     The temperature at one or more of the Facilities was outside the range of commonly accepted standards in the industry, which caused the Servers to overheat and reduce their efficiency.

39.     C7 was repeatedly notified of the increased temperature issues that adversely affected the Servers at its Facilities, yet C7 failed to correct the issue.

40.     To further exacerbate C7's failure to adequately provide "advance cooling systems" within its Facilities, and as an independent breach of the SOW, on or about October 6, 2014, one or more of the Facilities at C7 experienced a power failure.

41.    The power failure caused the Servers to shut down for a period, which caused them to cease mining Bitcoin.

42.    Moreover, when power was restored to one or more of the Facilities, the ventilation fans—which are essential in attempting to keep the temperature in the Facilities within an acceptable range to operate the Servers—did not restart and caused the Servers to further overheat.

43.    As a result of the overheating, the Servers productivity in mining Bitcoin was reduced by 20–30%.

44.    In addition to adverse temperature fluctuations, C7 failed to provide adequate environmental conditions.  For instance, one or more of C7's Facilities failed to adequately prevent external contamination (i.e., dust, dirt, and insects) of the Servers.  Because of the external contamination, the Servers became damaged and/or further overheated, which decreased their productively and resulted in less total Bitcoin being mined.

45.    C7 was repeatedly notified of the external contamination issues that adversely affected the Servers at its Facilities, yet C7 failed to correct the issue.

**C7's Unlawful Possession of the Servers**

46.    Following execution of the Agreements, a payment dispute arose between the parties.

47.    As a result of the payment dispute, C7 wrongly shut off the power to the Servers—rendering them useless.

48.     Further, when CoinTerra attempted to retrieve the Servers from the Facilities, C7 refused to return the Servers to CoinTerra and willfully and unlawfully excluded CoinTerra from the Facilities.

49.      C7 currently possesses every Server contemplated under the Agreements, some of which are owned directly by CoinTerra's customers.

50.     Upon turning off the power to the Servers and wrongfully denying CoinTerra access to retrieve or otherwise inspect the Servers, C7's actions have caused CoinTerra to breach its "mining contracts" with its customers.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

51.     CoinTerra realleges and incorporates by reference each of the forgoing paragraphs as if fully set forth herein.

52.     The Agreements are binding and enforceable contracts between CoinTerra and C7.

53.     Based on the conduct described above, C7 has materially breached the terms of the Agreements.

54.     As a result of C7's material breaches of the Agreements, CoinTerra has suffered damages in an amount to be determined at trial.

55.     CoinTerra is therefore entitled to a judgment against C7 in an amount to be determined at trial, together with prejudgment and post-judgment interest at the highest legal rate, and the costs and attorney fees incurred in enforcing the Agreements.

## SECOND CLAIM FOR RELIEF
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.    CoinTerra realleges and incorporates by reference each of the forgoing paragraphs as if fully set forth herein.

57.    There was and is an implied covenant of good faith and fair dealing with respect to the Agreements between CoinTerra and C7.

58.    C7 was obligated to deal fairly and honestly with CoinTerra and to fulfill its commitments to CoinTerra.  C7 was prohibited from engaging in conduct that would render meaningless the Agreements with CoinTerra and prevent CoinTerra from obtaining the benefit of the Agreements.

59.    By reason of the acts, conduct and omissions set forth above, C7 has breached the covenant of good faith and fair dealing described above.

60.    As a result of C7's breaches of the implied covenant of good faith and fair dealing, CoinTerra has been severely damaged in an amount to be determined at trial.

61.    CoinTerra is therefore entitled to a judgment against C7 for damages in an amount to be determined at trial, together with prejudgment and post-judgment interest at the highest legal rate.

## THIRD CLAIM FOR RELIEF
### (Conversion)

62.    CoinTerra realleges and incorporates by reference each of the forgoing paragraphs as if fully set forth herein.

63.    CoinTerra owns or otherwise lawfully controls all of the Servers at issue.

64.     C7 has intentionally interfered with the Servers and exercised dominion or control over them.

65.     C7's actions have deprived CoinTerra of the possession or use of the Servers.

66.     C7's actions have caused CoinTerra damages in the amount to be determined at trial.

67.     CoinTerra is therefore entitled to judgment against C7 for damages in an amount to be determined at trial, together with prejudgment and post-judgment interest at the highest legal rate.

68.     Alternatively, in the event that C7 restores possession of the Servers to CoinTerra, CoinTerra is entitled to a judgment against C7 in an amount to be proved at trial, which shall not be less than the fair market value of the Servers for the period in which C7 converted the Servers to its own use and possession, together with interest thereon.

## FORTH CLAIM FOR RELIEF
### (Tortious Interference with Existing and Prospective Economic Relations)

69.     CoinTerra realleges and incorporates by reference each of the forgoing paragraphs as if fully set forth herein.

70.     C7 has interfered, and threatens to continue to interfere, with CoinTerra's existing and potential economic relations.

71.     C7's actions have been taken for an improper purpose and/or have been effected through improper means.

72.     C7's interference with CoinTerra's existing and potential economic relations has caused CoinTerra damage in an amount to be proven at trial.

73.     CoinTerra is being irreparably harmed by C7's actions, and CoinTerra has no adequate remedy at law.  CoinTerra is, therefore, entitled to preliminary and permanent injunctive relief barring C7 from further interfering with CoinTerra's existing and prospective economic relations.

### FIFTH CLAIM FOR RELIEF
**(Forcible Detainer)**

74.     CoinTerra realleges and incorporates by reference each of the forgoing paragraphs as if fully set forth herein.

75.     By force, or by menaces and threats of violence, C7 has unlawfully held and kept the Servers at the Facilities.

76.     Under Utah Code § 78B-6-801, C7 is guilty of a forcible detainer.

77.     CoinTerra has suffered damages, and continues to suffer damages, as a direct and proximate result of C7's forcible detainer.

78.     Pursuant to Utah Code § 78B-6-811, CoinTerra is entitled to a judgment of damages, to be trebled under subsection (3), against C7 in an amount to be proven at trial.

79.     Pursuant to Utah Code § 78B-6-812, CoinTerra is further entitled to an order of restitution directing C7 to vacate the Facilities, remove their personal property therefrom, and restore possession of the Facilities to CoinTerra, or be forcibly removed by a sheriff or constable.

## SIXTH CLAIM FOR RELIEF
### (Unlawful Exclusion Without Judicial Process)

80.     CoinTerra realleges and incorporates by reference each of the forgoing paragraphs as if fully set forth herein.

81.     By the acts described above, C7 has willfully and unlawfully excluded CoinTerra from the Facilities and prevented CoinTerra from removing the Servers without judicial process in violation of Utah Code § 78B-6-814.

82.     CoinTerra has not abandoned the Facilities, and no judicial process has been obtained by C7 to either authorize the exclusion of CoinTerra or prevent CoinTerra from removing the Servers.

83.     CoinTerra has suffered damages as a direct and proximate result of C7's unlawful exclusion and prevention.

84.     Pursuant to Utah Code § 78B-6-811, CoinTerra is entitled to a judgment of damages, to be trebled under subsection (3), against C7 in an amount to be proven at trial.

85.     Pursuant to Utah Code § 78B-6-812, CoinTerra is further entitled to an order of restitution directing C7 to vacate the Facilities, remove their personal property therefrom, and restore possession of the Facilities to CoinTerra, or be forcibly removed by a sheriff or constable.

## SEVENTH CLAIM FOR RELIEF
### (Writ of Replevin)

86.     CoinTerra realleges and incorporates by reference each of the forgoing paragraphs as if fully set forth herein.

87.     Pursuant to Rules 64A and 64B of the Utah Rules of Civil Procedure, CoinTerra is entitled to issuance of a writ of replevin with respect to all of the Servers, as more particularly described above.

## PRAYER FOR RELIEF

WHEREFORE, CoinTerra respectfully prays for the following relief:

1.     That C7, together with any of its agents and all others in active concert or participation with it, be preliminarily and then permanently enjoined from interfering with CoinTerra's existing and prospective economic relations.

2.     For an issuance of a writ of replevin in favor of CoinTerra with respect to all of the Servers.

3.     For an order of restitution directing C7 to vacate the Facilities, remove its personal property therefrom, and restore possession of the Facilities to CoinTerra, or be forcibly removed by a sheriff or constable.

4.     That CoinTerra be awarded damages, including punitive damages, plus prejudgment and post judgment interest at the highest legal rate in an amount to be determined at trial.

5.     That CoinTerra's damages be trebled, in an amount to be determined at trial.

      6.      That CoinTerra be awarded its costs of suit, including reasonable expenses and attorney fees.

      7.      That CoinTerra be awarded such other and further relief as the Court deems just and proper.

      DATED this 13th day of January, 2015.

MARSHALL OLSON & HULL, P.C.

BY:    /s/ Trevor C. Lang
        ERIK A. OLSON
        TREVOR C. LANG

ATTORNEYS FOR DEFENDANT
AND COUNTERCLAIM PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing **ANSWER AND COUNTERCLAIM** was filed this 13th day of January, 2015, via the Court's electronic system, which served all counsel of record.

/s/ Trevor C. Lang_____